Argued March 19, reversed and remanded with directions
May 12, reconsideration denied June 18, petitions for
review denied July 5, 1975

DUDDLES ET AL, *Appellants—Cross-Respondents, v.*
CITY COUNCIL OF WEST LINN ET AL (No. 85375),
*Respondents,* WEST ET AL, *Respondents—Cross-
Appellants.*
535 P2d 583

*Robert M. Greening, Jr.,* Portland, argued the cause for appellants—cross-respondents. With him on the briefs were Kennedy & King, Portland.

*John H. Hammond, Jr.,* Oregon City, argued the cause and filed the brief for respondents.

*Walter L. Crow, Jr.,* Portland, argued the cause for respondents—cross-appellants. With him on the brief were William L. Dickson, and Pozzi, Wilson & Atchison, Portland.

William A. Masters, Portland, filed a brief amicus curiae for Northwest Environmental Defense Center.

Before SCHWAB, Chief Judge, and FOLEY and THORNTON, Judges.

SCHWAB, C. J.

This writ of review proceeding presents numerous questions relevant to the validity of a zone-change decision. Respondents West and Chappel applied to the respondent city council to change the zoning applicable to certain property they owned from residential to commercial as the first step toward construction of a shopping center. After hearing, the city council granted the requested change. Petitioners challenged that zone change by way of this

proceeding. The circuit court resolved all issues against petitioners and they now appeal.

The significant preliminary questions involve the standing required to maintain this type of action, and the procedures by which standing should be determined. On the merits the significant questions are whether a public need for the zone change was proven as required by *Fasano v. Washington Co. Comm.*, 264 Or 574, 507 P2d 23 (1973), and whether the zone change is consistent with the comprehensive plan as required by *Fasano* and *Baker v. City of Milwaukie*, 271 Or 500, 533 P2d 772 (1975).

## I. JOINDER.

There is one minor issue that should first be considered because of its bearing on the standing questions: the issue of whether the circuit court erred in denying a motion for an order permitting the joinder of Mary McDermott as a co-petitioner.

The petition for the writ of review was filed and the writ issued on November 21, 1973. On December 6, respondents West and Chappel moved for an order quashing service of the writ on the ground that the petitioners "lack standing because of the remoteness of their real property from the real property described in the petition herein." On January 10, 1974, petitioners moved for an order permitting joinder of Mary McDermott as a co-petitioner. The apparent purpose of this motion was to strengthen the petitioners' standing position, a question then unresolved in the trial court.

The motion to join McDermott was accompanied by her affidavit, alleging:

"* * * I received notification from the City of West Linn of a proposed zone change for the

314

property which is the subject of this law suit * * * ①

"* * * * *

"* * * I attended the public hearings at which the proposed use and proposed zone change were discussed before the West Linn City Council, and that I spoke in opposition to such change and such use at those hearings.

"* * * * *

"* * * [M]y property is located very near the proposed zone change and shopping center.

"Therefore, I am vitally interested in the subject matter of this law suit and in the relief requested by the petition for writ of review."

The motion to join McDermott was denied by the trial court. This is assigned as error by petitioners.

We have difficulty understanding respondents' arguments in support of the trial court's ruling. ORS 13.160 allows joinder of all "persons having an interest in the subject of the suit, and in obtaining the relief demanded." ORS 16.370 permits amendment of a pleading as a matter of course at any time "before the period for answering it shall expire." Once a writ of review has been issued, the only answer to it is the return with a certified copy of the record. ORS 34.060. Before January 10, when petitioners moved to join McDermott, the trial court had extended the time for return to the writ to February 15, as permitted by ORS 16.050. Hence, it would seem that petitioners should have been permitted to amend as a matter of course, ORS 16.370, to add McDermott as a co-petitioner.

---

① Section 10.060(2)(a) of the Zoning Ordinance of the City of West Linn requires that written notice of a zone-change hearing "shall be mailed to all owners of property within 300 feet of the exterior boundary of the property proposed to be changed."

██ Alternatively, ORS 16.390 permits amendment of a pleading "at any time before trial," including amendment "by adding the name of a party." The court's discretion in passing on a motion to amend "must be exercised in the furtherance of justice." *Morrill v. Rountree,* 242 Or 320, 325, 408 P2d 932 (1965). Assuming the truth of the McDermott affidavit, not controverted by respondents, we perceive no way in which justice is furthered by denying her joinder. Petitioners did not seek to change the substance of the petition for writ of review, of which respondents had actual notice. The fact that petitioners sought to add a party who would conceivably meet respondents' standing objection does not justify denial of the motion. After all, most amendments to most pleadings are designed to minimize or negate an objection raised by the opposite party.

██ Respondents argue the motion to join McDermott was "not timely," contending it was made more than "60 days from the date of the decision or determination sought to be reviewed." ORS 34.030. On September 27, 1973, after hearing the evidence, a majority of the city council voted in favor of an oral motion to grant the requested zone change. The following November 14 the city council formally adopted an ordinance that effectuated the zone change. Respondents would begin computing the 60-day limitation period of ORS 34.030 from September 27. Respondents are incorrect. The orally announced decision of a judge does not begin the limited period for appeal; only the entry of a formal written judgment has that effect. Here, by analogy, the orally announced decision of the city council was not a critical event; instead, the 60-day limitation period began when the city council rezoned the property in question by ordinance adopted on November 14. Thus, the motion to join McDermott filed on January 10 was made within the

statutory 60-day period for filing a petition for writ of review.[2] The motion to join McDermott was timely. It should have been allowed.

## II. THE MERITS.

Ordinarily, we would next consider preliminary questions, such as standing, if they were dispositive. On the record here presented, however, we find it impossible to finally resolve the standing questions. *See,* Part III, infra. Since a remand is necessary, since we have determined McDermott should be allowed to be joined as a co-petitioner, since we think it more likely than not that McDermott will be found to have standing,[3] and since all parties are probably interested in the expeditious conclusion of this litigation,[4] we will state our views on the merits. And we discuss the merits at this point because much of this discussion is necessary background to consideration of the standing questions.

### A. The Facts.

Respondents West and Chappel own a large tract of land on the west side of Portland Road (Highway 43) in the Robinwood section of West Linn.

---

[2] Subsequent to the trial court's ruling on the motion to join McDermott, Meury v. Jarrell, 269 Or 606, 525 P2d 1286 (1974), aff'g 16 Or App 239, 417 P2d 1221 (1974), established that a petition for a writ of review can be amended after the statutory 60-day period for filing the petition has expired.

[3] We do not hold that McDermott does have standing. We only suggest that, reading her affidavit in support of joinder together with Section 10.060(2)(a) of the Zoning Ordinance, n 1, supra, it appears that she probably has standing. However, this question must be determined by way of further proceedings in the trial court. *See,* Part III(B), infra.

[4] When moving in the trial court to require petitioners to post a penal bond, respondent Chappel alleged that the "annual cost of the debt service" on the subject property "is $25,-000.00" and current "real property taxes * * * amounted to $4,231.25." Perhaps understating the obvious, Chappel concluded: "Every day that we are delayed in the development of the subject land, it is costing a considerable amount of money."

Initially, it was zoned R-10 (single family residential-low density). Rather than developing the property as permitted by the existing zoning, West and Chappel proposed constructing some homes, some apartments and a shopping center. The change from all homes to part homes/part apartments necessitated a zone change from R-10 to PD, not here in question.

What is in question is the rezoning of about six acres of the West-Chappel property from R-10 (residential) to C-D (commercial).

The West Linn Comprehensive Plan contemplates eventual full commercial and civic development in the downtown area, no partially residential. Around the downtown area will be six "closely knit neighborhood units" generally residential in nature. The plan provides that each of these neighborhoods shall have one commercial center: "These neighborhood commercial centers should be compact, efficient, properly related to surrounding development, and should not result in highway congestion." The Plan specifically prohibits scattered commercial development along Highway 43.

Consistent with the Plan, the West Linn Zoning Ordinance zones most of the Robinwood neighborhood low density residential, and provides for a commercial center for that neighborhood. The area zoned for commercial development is on the east side of Highway 43, directly across the highway from the subject property. It is zoned C-D (district commercial). It is referred to in the record as the "Graybill property."[5]

---

[5] The Graybill property consists of 4.2 acres. As we interpret the exhibits, there appears to be additional property on the east side of Highway 43 contiguous to the Graybill property, also zoned C-D, but not owned by Mr. Graybill. Extrapolating from the exhibits, this additional property is about one

## B.  Proven Need.

■ *Fasano* requires parties seeking a zone change, here West and Chappel, to prove "that there is a public need for the kind of change in question." 264 Or at 586. "The more drastic the change," here from low density residential to commercial, "the greater will be the burden of" proof. 264 Or at 586.

■ In general, there is merit to petitioners' contention that since the Comprehensive Plan and Zoning Ordinance both provide for a neighborhood shopping center—the undeveloped Graybill property directly across the highway from the subject property—it is impossible to show a public need to rezone the subject property from residential to commercial. However, in this case there is evidence in the record from which the city council could conclude that the area already zoned for commercial development was: (1) too small for feasible development;[⑥] and (2) not suited for commercial development because of its topography. Given that the Plan and Zoning Ordinance contemplate a neighborhood shopping center and that the

acre. If our interpretation of the exhibits is correct, it means the property on the east side of Highway 43 already zoned for commercial development totals about five acres or a little more.

The Graybill property was referred to frequently during the city council proceedings culminating in this challenged zone change. In context, however, it is rarely clear whether the references were to the smaller parcel literally owned by Mr. Graybill, or to the larger parcel already zoned commercial.

⑥ The "too-small" issue is a fairly close one. Persons connected with real estate development testified that the minimum economically feasible size for a neighborhood shopping center is five to six acres. It is clear that the Graybill property is 4.2 acres. But there appears to be another contiguous acre or so also zoned commercial. *See,* n 5, supra. This would make the existing commercially zoned property large enough for feasible development under the evidence here.

However, the city council may have reasoned that such commercial development on the east side of Highway 43 was unlikely because the acreage was not in single ownership.

property previously zoned for commercial development may be insufficient, there is evidence from which the city council could conclude that public need was established. We do not review do novo. *Dickinson v. Bd. of County Comm.*, 21 Or App 98, 533 P2d 1395 (1975).

■ C. Compliance with Comprehensive Plan.

*Fasano* requires proponents of a zone change to prove that the change "is in conformance with the comprehensive plan." 264 Or at 586. Recently, the Supreme Court expanded this requirement in *Baker v. City of Milwaukie*, supra, concluding:

"* * * [A] comprehensive plan is the controlling land use planning instrument for a city. Upon passage of a comprehensive plan a city assumes a responsibility to effectuate that plan and conform prior conflicting zoning ordinances to it. We further hold that the zoning decisions of a city must be in accord with that plan and a zoning ordinance which allows a more intensive use than that prescribed in the plan must fail." (Slip opinion at 14-15.)

The relevant provisions of the West Linn Comprehensive Plan state:

"GENERAL CONCEPTS AND OBJECTIVES
"* * * * *

"The plan should allow for the establishment of a civic and commercial 'center' for West Linn as a whole. In addition, there should be 'centers' at the neighborhood and community level. These 'centers' will be suitable locations for public and semi-public functions, shopping, services, and professional offices. Vehicular access to them should be convenient, and pedestrian circulation within them should be safe and pleasant.

"NEIGHBORHOOD UNIT PLANNING PRINCIPLES

"A distinguishing characteristic of West Linn is that it is divided into somewhat separate, isolated and distinct neighborhoods and communities. One of the advantages of a neighborhood is that it gives residents a feeling of belonging within a limited community of interest. The geography of the land adjacent to West Linn lends itself to the delineation of future neighborhoods of appropriate size.

"\* \* \* \* \*

"Some of the things which can be accomplished through the neighborhood concept are:

"\* \* \* \* \*

"7. To create neighborhood trade areas of such size that each can support its own convenient local commercial and service center.

"LAND USE

"\* \* \* \* \*

"It would be desirable for the residents of West Linn and nearby areas to be able to obtain a wider variety of commercial goods and services within establishments situated in West Linn. The plan allows for the development of commercial centers in each major area of the city: Willamette, Sunset, Holly-Bolton, Robinwood, and Rosemont. These neighborhood commercial centers should be compact, efficient, properly related to surrounding development, and should not result in highway congestion. They should be adequate in size to accommodate all local demands for business and service.

"Scattered commercial encroachments, particularly along Highway 43 and other major arterials, will not be allowed."

The question of whether the zone change in question is in compliance with the Comprehensive Plan breaks down into three areas of concern: (1) the

size of the neighborhood shopping center contemplated by the Plan; (2) the requirement that neighborhood centers not create highway congestion; and (3) the prohibition against scattered commercial development along Highway 43.

Although the Plan clearly contemplates a shopping center in the Robinwood neighborhood, it is somewhat ambiguous on the size of the contemplated commercial area. The "neighborhood trade area" is to be "compact" and only large enough "to accommodate all local demands for goods and services." There was conflicting evidence from which the city council was entitled to conclude that the size of the subject property (about six acres) would provide for a compact development and serve local needs. However, the problem is that rezoning the subject property commercial (about six acres) while leaving the property directly across Highway 43 commercial (at least 4.2 acres—*see,* nn 5 and 6, supra), creates the possibility of commercial development in the middle of the Robinwood neighborhood that is almost twice the size of what the city council must have found to be appropriate for a "compact" shopping center to serve "local" needs.

The Comprehensive Plan requires that neighborhood commercial centers "should not result in highway congestion." There is evidence that commercial development of the subject property would reduce highway congestion because persons living on the west side of Highway 43 could shop without having to enter that arterial street. But if both the subject property on the west side of Highway 43 and the Graybill property on the east side of that street were commercially developed, as permitted by the existing zoning, there is no evidence this would minimize highway congestion; instead, there is every indication it would increase highway congestion.

Finally, the Comprehensive Plan prohibits "scattered commercial encroachments" along Highway 43. It is not clear that changing the zone applicable to the subject property, while leaving the Graybill property zoned commercial, will do other than create scattered commercial encroachments.

■ For all of these reasons we conclude that rezoning of the subject property, when considered together with leaving the Graybill property zoned commercial, was not proven to be in compliance with the West Linn Comprehensive Plan.

If it is ultimately determined that any of the parties petitioners have standing, *see,* Part III, *infra,* it will be necessary to reverse the decision of the city council. The council's alternatives would then appear to be:

(1) To amend its Comprehensive Plan to clearly provide that full commercial development of all of the subject property and the property across Highway 43 previously zoned commercial is consistent with the Plan's concept of a local neighborhood shopping center in the Robinwood area; the Plan could have been amended at the same time this zone change was considered, *cf., Marggi v. Ruecker,* 20 Or App 669, 533 P2d 1372, n 1, Sup Ct *review denied* (1975); or

(2) To downzone the property on the east side of Highway 43 if, as appears from this record, it is determined that the subject property is the appropriate size for a local neighborhood shopping center, and the subject property is more suited for commercial development for the reasons noted above.

## III. STANDING.

The standing issues here break down into distinct components: (A) questions relating to the controlling substantive standards; and (B) questions relating to

the proper procedures to be used in deciding a standing question.

## A. Substantive Standards.

A petitioner needs to establish "injury of some substantial right," ORS 34.040, in order to have standing to prosecute a writ of review proceeding.[7] Much of the argument addressed to us in this case involves proper construction of this statutory standard in the context of a challenge to a zone-change decision.

The briefs express a wide range of views on what the controlling standard should be. Petitioners claim that they live in the Robinwood neighborhood, that the challenged zone-change decision "injured the environmental and aesthetic living conditions" in their neighborhood, and that this should confer sufficient standing. The claimed environmental and aesthetic interests are "the quiet, wooded, residential environment of their neighborhood," which are said to be "directly and adversely affected by the city council's decision to allow the zone change for the proposed commercial development." More specifically, petitioners

> "contend the development of both the Robinwood Center [on the subject property] and the Graybill property across Highway 43 will increase traffic congestion, decrease air quality, cause development of a commercial strip, and establish a second city center in Robinwood, in contravention

---

[7] ORS 227.180(4), enacted by Oregon Laws 1973, ch 739, §§ 11, 12, p 1773, is also conceivably relevant, although not raised in this appeal. It provides:

"Any person described by subsection (1) of this section who is *aggrieved* by the action of a city council under subsection (3) of this section may seek a review thereof as provided by ORS 34.010 to 34.100." (Emphasis supplied.)

*See also,* ORS 215.422(4) which states the same rule in the context of county zoning.

of the Comprehensive Plan * * *. Such development would destroy the residential nature of the Robinwood neighborhood, which was the substantial motivation behind * * * [petitioners'] decisions to purchase their homes. This destruction of the aesthetic character of the neighborhood is an injury in fact to * * * [petitioners'] rights, giving them standing to challenge the City Council's decision."

The essence of petitioners' position is, "Standing may stem from non-economic values as well as from economic ones," citing *Data Processing Service v. Camp,* 397 US 150, 153, 90 S Ct 827, 25 L Ed 2d 184 (1970).

The Northwest Environmental Defense Center (NEDC), appearing as amicus curiae, also argues that petitioners have sufficient standing in this case. NEDC's analysis is that petitioners do have a right to the aesthetic enjoyment of their property, and that this is a substantial right within the meaning of a writ of review statute, ORS 34.040. NEDC relies on three lines of authority. First,

"The Oregon Supreme Court indirectly acknowledged such right [to aesthetic enjoyment of property] in *Oregon City v. Hartke,* 240 Or 35, 400 P2d 255 (1965). There, the Court held that a municipality could exclude a use of property solely on the ground that the use offends aesthetic sensibilities. The right of the municipality to safeguard the aesthetic sensibilities of its inhabitants perforce implies that the inhabitants have such an interest to protect."

Second, NEDC draws an analogy to Oregon nuisance cases, said to directly recognize the right of an individual to the aesthetic enjoyment of his property.[9]

---

[9] Borden v. City of Salem, 249 Or 39, 436 P2d 734 (1968); Thornburg v. Port of Portland, 244 Or 69, 415 P2d 750 (1966);

Third, NEDC cites Federal cases interpreting standing requirements under the federal Administrative Procedures Act; for example, *Sierra Club v. Morton,* 405 US 727, 734, 92 S Ct 1361, 31 L Ed 2d 636 (1972):

"* * * Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process * * *."

*See also, United States v. SCRAP,* 412 US 669, 93 S Ct 2405, 37 L Ed 2d 254 (1973).

Surveying the law of other jurisdictions, NEDC reports there are a variety of approaches to the standing question in zoning cases:

"The most conservative and perhaps earliest interpretation is that to have standing a neighboring property owner must allege and prove both proximity to the rezoned land and special damages (injury peculiar to his property or more substantial than that suffered by the community at large). E.g., *Krejpco v. Zoning Board of Appeals,* 152 Conn 657, 211 A2d 687 (1965); *Victoria Corp. v. Atlanta Merchandise Mart, Inc.,* 101 Ga App 163, 112 SE2d 793 (1960); *Downey v. Incorporated Village of Ardsley,* 152 NYS2d 195 (1956); Comment, Standing to Appeal Zoning Determination: 'The Aggrieved Person Requirement,' 64 Mich L Rev 1070 (1966). A variation of this interpretation is one that establishes prima facie standing if appellant is within proximity of the rezoned land. If appellant is not within proximity of the rezoned land, he may still have standing if he can prove

Aldridge v. Saxey, 242 Or 238, 409 P2d 184 (1965); Amphitheaters, Inc. v. Portland Meadows, 184 Or 336, 198 P2d 847, 5 ALR2d 690 (1948); Kramer v. Sweet, 179 Or 324, 169 P2d 892 (1946).

special damages. *Bryniarski v. Montgomery County Board of Appeals,* 247 Md 137, 230 A2d 289 (1967).

"A second interpretation has been that residents of the neighborhood or zoning area whose quiet enjoyment of residence is jeopardized by anticipated use of the rezoned land have standing to seek judicial review, even though their injury is not particularly special when compared to that of the rest of the community in which they reside. See *Sierra Club v. Morton,* supra; *Horan v. Board of Appeals,* 164 NYS2d 543 (1957); *Anderson v. Island County,* 81 Wash2d 312, 501 P2d 594 (1972).

"The third and seemingly most liberal interpretation is that individuals within the community have standing as sort of private attorney generals to assert the communities' interest in the scenic beauty of their community, even though they have alleged no special personal or economic harm to themselves or any particular proximity to the rezoned land other than that it is situate in the same community or neighborhood in which they reside. *Tuck v. Heckscher,* 65 Misc2d 1059, 320 NYS2d 419 (1971); *Citizens Committee for Hudson Valley v. Volpe,* 425 F2d 97 (2nd Cir 1970)."

On the other hand, respondents West and Chappel and the respondent city council, appearing separately, argue for a restrictive interpretation of the standing requirement in zoning cases. Respondents West and Chappel would require some injury other than any general injury shared equally by all the residents of the City of West Linn. According to West and Chappel, "the right that every citizen has in relation to the proper enforcement of ordinances and laws generally" should not be sufficient to confer standing. Instead, damage should be required "which is not common to other residents and property owners," such as the pecuniary harm of decreasing the value of petitioners' property.

The respondent city council warns that we should not allow "virtually any citizen within the state standing to contest by writ of review virtually any zoning or land use decision in the state regardless of its geographical location." Most of the city council's analysis would limit standing to parties suffering "personal economic injury," or, stated differently, damage to property interests "different than that suffered by the general public." But at another point, the city council's analysis becomes less clear when it concedes that

> "* * * under certain aggravated conditions, damage to the aesthetic enjoyment of one's property, if proven, would be sufficient to give an individual standing by satisfying the substantial injury requirements of ORS 34.040. Such substantial and personal, aesthetic injury would normally be associated with concurrent and substantial economic injury such as that described in the Frankland v. City of Lake Oswego [267 Or 452, 517 P2d 1042 (1973)] * * *."

As interesting and important as these standing questions are, we find the present record insufficient to fully resolve them. We have previously assumed that a noncontiguous property owner in reasonably close proximity to rezoned property has standing to challenge the rezoning decision. *See, Bergford v. Clack. Co./Trans. Serv.,* 15 Or App 362, 515 P2d 1345 (1973); *Brandt v. Marion County,* 6 Or App 617, 488 P2d 1391 (1971). We continue to believe that contiguous ownership should not be the *sine qua non* of standing; if it were, land developers could effectively insulate some zone-change decisions from judicial review if they were the only contiguous owner.[9] And

---

[9] In this case, for example, West and Chappel, the proponents of the zone change, own most of the land contiguous to the subject property rezoned from residential to commercial.

we continue to believe that a property owner in reasonably close proximity—such as within sight or sound of a proposed use of land—should ordinarily have standing to challenge a zoning decision.

B. Procedures to Determine Standing.

The reason we can go no further on the substantive standing questions is this: There is little information in the record on the facts relevant to standing—the distances between petitioners' property and the subject property, whether any of the petitioners would be able to see the proposed shopping center, the details and probabilities of the claimed aesthetic injuries, etc. This gap in the record is understandable because of what we consider to be an erroneous belief, apparently shared by all parties, about the proper procedures to be followed when a standing question is raised in a writ of review proceeding.

■ Oregon cases have often repeated the rule that in writ of review proceedings the trial court is limited to review of the record developed before the inferior tribunal, and cannot conduct a de novo trial.[⑩] Regarding the *merits* of the inferior tribunal's determination, this rule preserves the purpose of the writ of review. However, regarding *standing* questions, the rule is unworkable because either standing might not have been an issue before the inferior tribunal or, if an issue, might have been determined by the inferior tribunal under a different standard than stated in ORS 34.040, applicable once the matter reaches the court system. We therefore conclude that when standing questions arise in writ of review proceedings, it will be necessary to conduct an evidentiary hearing in circuit court limited to the facts germane to standing under ORS 34.040.

---

[⑩] *See* Bechtold et al v. Wilson et al., 182 Or 360, 366, 186 P2d 525, 187 P2d 675 (1947); Asher v. Pitchford, 167 Or 70, 74-75, 115 P2d 337 (1941); Lechleidner v. Carson, 156 Or 636, 645, 68 P2d 482 (1937).

The present record documents the need for this approach. Many citizens of West Linn testified pro and con at the city council meeting that culminated in the zoning decision here challenged. The city council listened to all who rose to speak. Each witness began by identifying himself or herself; most at least named the street they lived on; some gave the specific house number; but some only indicated the area of town where they lived; and a few did not identify their interest in the matter in any way. On this record, it is impossible to even begin to determine the standing, for purposes of ORS 34.040, of most of the witnesses who spoke for or against the challenged zone change.

■ Moreover, it is apparent that the city council is free to adopt its own standards governing standing to appear before it, i.e., to provide who is and who is not entitled to remonstrate before the city council, so long as those standards are consistent with due process requirements. There is some indication in this case that the city council has adopted such standards.[9] However, it is also clear from the record that the city council disregarded any limitations on who could speak, listening to all citizens who wanted to do so, as is perhaps understandable, given that the city council is composed of locally elected officials. The point remains, however, that a city council's standing rules, if any, would not necessarily be the same as the standing requirement of ORS 34.040, which becomes applicable once the matter is brought before a state court by way of a petition for a writ of review.

Rather than relying on the record made before

---

[9] At one point the Mayor, presiding over the city council meeting, stated: "any individual that received notice of the hearing tonight may stand and give their statement now." Notification of the meeting was required to be given to property owners within 300 feet of the proposed zone change. *See,* n 1, supra.

the inferior tribunal to decide standing in circuit court, it is necessary to use some other procedure. ORS 1.160 provides:

"When jurisdiction is, by the constitution or by statute, conferred on a court or judicial officer, all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by the procedural statutes, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the procedural statutes."

We conclude that a circuit court evidentiary hearing on the facts relevant to standing is "most conformable" to the spirit of the statutes.

In conclusion, we hold that a party who remonstrated before an inferior tribunal has prima facie standing to initiate a writ of review proceeding to challenge the decision of the inferior tribunal. The respondents then have the burden of raising the objection of insufficient standing under the terms of ORS 34.040. Resolution of such an objection will require conducting an evidentiary hearing. The petitioners bear the burden of proving standing at such a hearing.

We note that the parties to this proceeding attempted something akin to the procedures we here require. Both sides submitted factual representations to the trial court and to us about the petitioners' standing that went beyond the record before the city council. The respondents obtained an order from the circuit court permitting them to take the petitioners' depositions on facts relevant to standing, although such depositions are not in the record before us. It is not clear, however, whether the trial court felt itself limited to the city council record or also considered the additional factual representations in passing on

the standing question. In these circumstances, we think it is appropriate to remand for overt and full development of the relevant facts in an evidentiary hearing.

## IV. CONCLUSION.

The decision of the trial court is reversed and this cause is remanded with the following directions: (1) to permit the joinder of Mary McDermott as a co-petitioner; (2) to conduct an evidentiary hearing on the standing question in accordance with the views expressed herein; and (3) if it is determined that any of the petitioners have standing, to reverse the zone-change decision of the city council and remand to the council for further proceedings consistent with this opinion.