Argued and submitted June 7, affirmed November 23, 1982

# BENTON COUNTY,
*Petitioner for review,*
*v.*
# FRIENDS OF BENTON COUNTY,
*Respondent on review.*

(LUBA Case No. 81-024, CA A21709, SC 28628)

653 P2d 1249

Richard T. Ligon, Benton County Counsel, Corvallis, argued the cause and filed a brief for petitioner on review.

Richard C. Stein, Salem, argued the cause and filed a brief for respondent on review. With him on the brief was Ramsay, Stein, Feibleman & Myers, Salem.

Before Denecke,** Chief Justice, Lent, Linde, Peterson, Tanzer and Campbell, Justices.

LINDE, J.

---

** Denecke, C. J. retired June 30, 1982.

## LINDE, J.

Benton County granted a conditional use permit to Morse Bros., Inc., to expand a gravel extraction operation on the east bank of the Willamette River on land designated for exclusive farm use in the county's comprehensive plan. Upon a petition by Friends of Benton County, a private association organized as a nonprofit corporation, the Land Use Board of Appeals (LUBA) found certain errors in the county's action and remanded the matter to the county for further proceedings. The county appealed LUBA's order on the grounds that LUBA had employed an erroneous test in allowing Friends of Benton County to challenge the conditional use permit and that the organization did not have standing to do so under the correct test. The Court of Appeals affirmed LUBA's order, 56 Or App 567, 642 P2d 358 (1982), and we allowed review because of doubts about the court's premises. We affirm for reasons stated below.

### I. *"Standing" as statutory law.*

We begin by noting what is and what is not presented by the appeal. Friends of Benton County petitioned and LUBA allowed it to appear in a "representational" capacity on the basis that one of its members, Clif Kenagy, is a landowner who had appeared in the county's proceeding and who would be aggrieved or adversely affected by the county's decision. The county resisted the petition on the ground that Mr. Kenagy did not have a sufficient interest to qualify as a petitioner before LUBA. It did not question that the organization would qualify if he did. The county made the same concession in the Court of Appeals and in this court. The Court of Appeals accepted this assumption on the strength of its decision in *1000 Friends of Oregon v. Multnomah County,* 39 Or App 917, 593 P2d 1171 (1979).

This court has not examined or approved the concept of "representational standing." If we were to do so, a number of questions would have to be briefed and considered.[1] They were not made an issue in this case,

---

[1] For example:

Does it matter whether the organization claiming "representational standing" is incorporated or otherwise had legal personality capable of independent legal

and we do not decide them. We mention only that this issue and the issue of the individual rights of the member from which Friends of Benton County derives its standing before LUBA both illustrate a common problem in judicial review of governmental action. The problem arises from the inveterate practice of seeking and citing statements of rules in judicial opinions, even when the rules have their sources not in common law but in statutes that differ from one agency to another, from one form of judicial review to another, and often from one legislative session to the next.

This is notably true of "standing." "Standing" is not common law. Some statutes expressly provide who may seek review of specific governmental actions. Other statutes prescribe more generally who may invoke one or another form of relief against various governmental actions. The statutory criteria are by no means uniform or consistent. Nevertheless, a decision accepting or declining review to a party in a certain position often is said to hold that such a party has "standing," and this proposition thereafter is cited for or against such "standing" to obtain relief under different statutes. Also, because the literature of

---

action in its own name? Must the organization have existed before the controversy in which it wishes to appear, or may it be formed for the purpose of contesting the specific governmental action? Must the organization show membership support for its position on the disputed issue?

If the organization claims standing only by virtue of the interest of a member, must the member personally join in the request for review? Alternatively, must the member agree with the views asserted by his "representative" organization, and is this a disputable issue? If not, why is the member's personal standing relevant to the organization's standing to pursue review?

In *McCall v. Legislative Assembly,* 291 Or 663, 672, 634 P2d 223 (1981), a special proceeding which may be initiated by petition of "any qualified elector," Or Const art IV, § 6, this court took care to refer only to the individual public and organizational officials who appeared as petitioners rather than to the entities on whose behalf they appeared, such as the League of Women Voters and neighborhood associations. In *Marbet v. Portland Gen. Elec. Co.,* 277 Or 447, 454, 561 P2d 154 (1977), in which petitioner purported to represent a minuscule organization, we noted:

"Inquiry into how and how far these groups authorized his testimony proved unenlightening. But nothing of legal importance hinges on the widespread practice of presenting viewpoints on public policy under some banner embroidered for the occasion."

This does not imply a negative answer to the question of organizational standing before agencies or courts. But the answer, as for individual standing, must be sought in applicable statutes and agency rules.

administrative law deals largely with federal law, much "standing" doctrine is argued and "adopted" from federal decisions, although these often focus on the "case or controversy" requirement of federal jurisdiction under Article III of the United States Constitution.

The fragmentation and perhaps needless complexity of Oregon's statutes on judicial review appear in recent decisions in which we have had to examine standing to seek review under the administrative procedure act, under the declaratory judgment act, by writ of review, by writ of mandamus, and under other statutes. *Marbet v. Portland General Electric, supra* n. 1, held that a person who had been admitted as a party to a contested case under the administrative procedure act was entitled by the terms of that act to pursue judicial review without further proof of injury. We noted that "[n]either the issue of standing under the administrative procedure act nor the issue of intervention under the energy facility siting act depends on generalizations of administrative law. Both issues have been resolved by the legislature." 277 Or at 453. In *Gruber v. Lincoln Hospital District,* 285 Or 3, 588 P2d 1281 (1979), a person seeking to invalidate acts of the district as a "resident and taxpayer" was barred because his complaint failed to show the impact of the challenged acts on his "rights, status, or other legal relations" required by the declaratory judgment act, ORS 28.020. Such a showing, however, sometimes has not been required when a writ of mandamus is sought to enforce a "public right"[2] on the relation of a party "beneficially interested." ORS 34.130. In *Strawberry Hill 4-Wheelers v. Board of Comm'rs for County of Benton,* 287 Or 591, 601 P2d 769 (1979), we reviewed the century-old conundrum of challenges to the conduct of "county business" by a writ of review expressly limited to "judicial or quasijudicial functions" exercised "to the injury of some substantial right of the plaintiff, and not otherwise." Former ORS 203.200; former ORS 34.040. There we wrote:

"References to 'standing,' without more, risk treating this term as a generic concept whose contours may be drawn indiscriminately from decisions interpreting diverse statutes or U.S. Const. art. III, § 2, or from the

---

[2] *See Putnam v. Norblad,* 134 Or 433, 436-438, 293 P 940 (1930).

academic literature. But statutes often provide differentiated requirements for 'standing' before an agency or to obtain different judicial remedies."

287 Or at 609 n. 8. And we repeated an observation made in *Gruber, supra,* that courts can do little to formulate coherent rules of standing or other aspects of judicial review in the absence of a systematic statutory framework. *Id.* at 608 n. 7.

In this case, the Court of Appeals rested respondents' "representational standing" on its earlier decision in *1000 Friends of Oregon v. Multnomah Co.,* 39 Or App 917, 593 P2d 1171 (1979). That decision, in turn, cited cases in the Supreme Court of the United States without explaining how those cases, or the laws under which they were decided, related to the jurisdictional basis of the case before the Court of Appeals. Moreover, the present case comes to court under different statutory provisions for review from those in *1000 Friends of Oregon v. Multnomah County* or in two other cases also cited by the Court of Appeals.[3] These provisions were extensively considered and revised when the Land Use Board of Appeals was created in 1979. Therefore, insofar as Friends of Benton County made no effort to claim standing before LUBA except as a "representative" of its member Kenagy, the latter's qualification as a petitioner before LUBA must be examined under the 1979 law.

## II. *The 1979 statutes.*

· Unlike prior land use cases initiated in circuit courts by writ of review, the present case involves two distinct provisions for review, the first governing review by the Land Use Board of Appeals and the second judicial

---

[3] At the time of *1000 Friends of Or. v. Multnomah Co., supra,* ORS 197.300(1)(d) provided that any person or group "whose interests are substantially affected" could challenge a land use decision before the Land Conservation and Development Commission.

*Clark v. Dagg,* 38 Or App 71, 588 P2d 1298, *rev den* 286 Or 637 (1979), and *Duddles v. City Council of W. Linn,* 21 Or App 310, 535 P2d 583 (1975), cited by the Court of Appeals in this case, did not involve review of local decisions by a state land use agency but writs of review in circuit courts under ORS 34.010 to 34.100, specifically the requirement of "injury of some substantial right" under former ORS 34.040. In *Clark,* the plaintiff also had to be "aggrieved" under former ORS 215.422, and the court equated the two terms. 38 Or App at 77. The *Duddles* court expressly did not deal with review by an "aggrieved" person. 21 Or App at 323 n. 7.

review by the Court of Appeals. Oregon Laws 1979, chapter 772, prescribed procedure before the board in section 4 and judicial review in section 6a. Section 4, provided:

"(2) Except as provided in subsection (3) of this section, any person whose interests are adversely affected or who is aggrieved by a land use decision and who has filed a notice of intent to appeal as provided in subsection (4) of this section may petition the board for review of that decision. . . .

"(3) Any person who has filed a notice of intent to appeal as provided in subsection (4) of this section may petition the board for review of a quasi-judicial land use decision if the person:

"(a) Appeared before the city, county or special district governing body or state agency orally or in writing; and

"(b) Was a person entitled as of right to notice and hearing prior to the decision to be reviewed or was a person whose interests are adversely affected or who was aggrieved by the decision."

A further relevant provision states that the petition for review shall state "[t]he facts that establish that the petitioner has standing." Or Laws 1979, ch 772, § 4(6)(a).

Review by LUBA thus is not limited to persons who can show "injury of some substantial right," as it was under the writ of review, or "whose interests are substantially affected," as ORS 197.300 prescribed at the time of *1000 Friends of Oregon v. Multnomah County, supra* n. 3. Instead, the 1979 statute allowed a petition to the board by any person who fits within the foregoing provisions.[4] The provisions differ depending on whether the land use decision qualifies as "quasi-judicial." Subsection (2) allows a petition to LUBA, after a notice of intent to appeal, by any person "whose interests are adversely affected" or, in the alternative, "who is aggrieved by the decision," except when the decision is quasijudicial. In such a case, the petitioner must have appeared orally or in writing before the body making the decision to be reviewed but need not be either

---

[4] " 'Person' means any individual, partnership, corporation, association, governmental subdivision or agency or public or private organization of any kind." Or Laws 1979, ch 772, § 3(2).

affected or aggrieved if the petitioner was entitled to notice and to be heard before the decision was made.

An examination of the legislative history of the 1979 law, helpfully collected in the county's supplemental brief, does not disclose any extensive explanation of the two phrases "whose interests are adversely affected" and "who is aggrieved." They do, however, represent a deliberate change from the prior formula for review of land use decisions and from the bill as originally introduced, which proposed to allow review to persons who appeared in the land use proceeding and either were entitled to notice and hearing or had "a substantial interest in the decision."[5]

The different phrasing for petitions to the new Land Use Board of Appeals was proposed by the governor's executive assistant, Lee Johnson. A staff memorandum to the Senate committee studying SB 435 set out the difference between the provisions drawn from the statutory writ of review and from the administrative procedure act and presented the choice as the first major "policy issue" to be decided by the committee. Eventually the substitute was chosen. Also the committee deleted a proposed amendment that a "substantial interest" be required for petitions by persons whose standing to seek review rested on their entitlement to notice and hearing before the decision. The requirement of a "substantial interest" survived in section 13 of the bill, which amended the law governing writs of review in the courts, ORS 34.040. On this record of deliberate change, we cannot accept the county's position that the phrases actually enacted meant only to retain the existing interpretation of the rejected term "substantial interest" under the prior writ of review procedure.

The phrases proposed by Mr. Johnson and adopted by the legislature differ slightly from those of Oregon's administrative procedure act.[6] There, in turn, they have

---

[5] SB 435, § 2(2)(b) (1979). This language was deleted by the amendments establishing LUBA. A good summary of the 1979 legislation on standing before LUBA appears in Hickam, *Review of Oregon Legislation, 1979: The Land Use Board of Appeals,* 16 Will L Rev 323, 328-332 (1979).

[6] ORS 183.480:

"(1) Any person adversely affected or aggrieved by an order or any party to an agency proceeding is entitled to judicial review of a final order, whether such order is affirmative or negative in form...."

antecedents in the federal administrative procedure act and prior statutes at least as far back as the federal Communications Act.[7] It does not follow from this characteristic resort to familiar legal phraseology that they import into Oregon law all the preexisting federal case law.[8] Nor should these phrases be ascribed simply to the legal penchant for saying the same thing in two different ways. In a case under the Oregon APA before 1979, this court distinguished between "adversely affected" and "aggrieved," stating that " 'aggrieved' means something more than being dissatisfied with the agency's order, yet distinct from being 'adversely affected' by it." *Marbet v. Portland General Electric, supra* n. 1, 277 Or at 457. This interpretation of "aggrieved" in ORS 183.480 was known before Mr. Johnson and the legislature drew upon that source to define standing before LUBA under section 4(3)(b).

Two illustrations show how the test of being "aggrieved" can avoid argument over the meaning of "adversely affected." A person who wishes to appeal a ruling in his favor, but one less favorable than

---

The parties have offered no explanation for the addition in chapter 772 of "whose interests are" before "adversely affected." Arguably the phrase broadens the test insofar as a person may have "interests" beyond those that affect the person's property or wellbeing in the narrower sense.

[7] Administrative Procedure Act, § 10(a), 60 Stat 237, 243 (1946), formerly 5 USC § 1009(a), *see* now 5 USC § 702 (1976); Communications Act, § 402(b)(2), 48 Stat 1064, 1093 (1934), 47 USC § 402(b)(6) (1976).

Many New Deal statutes provide for review of administrative proceedings at the instance of a person or party who is "aggrieved," without the "adversely affected" test. *See* Investment Advisers Act, § 213(a), 54 Stat 855 (1940), 15 USC § 80b-13(a) (1976); Investment Company Act, § 43(a), 54 Stat 844 (1940), 15 USC § 80a-42(a) (1976); Hatch Political Activity Act Amendments, § 12(c), 54 Stat 768 (1940), now 5 USC § 1508 (1980 Supp); Natural Gas Act, § 19(b), 52 Stat 831 (1938), 15 USC § 717r(b) (1976); Federal Power Act, 49 Stat 860 (1935), 16 USC § 825 *l* (b) (1976); Public Utility Holding Company Act, § 24(a), 49 Stat 834 (1935), 15 USC § 79x(a) (1976); National Labor Relations Act, § 10(f), 49 Stat 455 (1935), 29 USC § 160(f) (1976); Securities Exchange Act, § 25(a), 48 Stat 901 (1934), 15 USC § 78y(a)(1) (1976); Securities Act, § 9(a), 48 Stat 80 (1933), 15 USC § 77i(a) (1976). Recent amendments to the Securities Exchange Act distinguish the two tests. *Compare* Securities Acts Amendments, § 20, 89 Stat 158 (1975), 15 USC § 78y(a)(1) (1976) ("person aggrieved by a final order"), *with id.,* 89 Stat 159 (1975), 15 USC § 78y(b)(1) (1976) ("person adversely affected by a rule").

[8] The federal APA and Communications Acts were thought to codify the existing federal law of standing. S.R. No. 752, 79th Cong., 1st Sess 44 (1945) (statement of Atty Gen Tom C. Clark regarding APA); Comm'n on Admin Proc, Administrative Procedure in Government Agencies, S Doc No. 8, 77th Cong, 1st Sess 85 (1941); HR No. 1850, 73rd Cong 2d Sess (1934) (Communications Act).

requested, is aggrieved without having to argue whether his interests are "adversely affected" by the partial victory. Such an argument otherwise might have at least surface plausibility where the statutory test had been changed from "substantially affected" to "adversely affected," but the separate term "aggrieved" makes this immaterial. Also, the "persons" who may seek review of land use decisions include governmental subdivisions or agencies and other "public organizations." Or Laws 1979, ch 772, § 3(2), *supra* n. 4. It might plausibly be argued that public agencies are assigned responsibility for various aspects of public policy but have no "interests" of their own to be "adversely affected" by an adverse decision. Again, however, a public agency may claim to be "aggrieved" by a decision against some public interest for which it has responsibility without debating whether the agency's own interest is "adversely affected." Who is "aggrieved" also may vary with the land use goal or other governing criteria that are said to be violated by the challenged decision.[9] The statute does not limit either adverse effect or aggrievement to property interests which must be in physical "proximity" to the disputed land use.

As in *Marbet*, therefore, we understand "aggrieved" to mean something distinct from an adverse effect on some personal self-interest. In this case, as in *Marbet*, the challenged action is a quasijudicial decision, that is to say, a decision limited in time and space to specific facts and named addressees rather than one promulgating a general rule addressed to an open class of persons and future events, and it has been adopted in a quasijudicial proceeding. In general rulemaking there ordinarily are no "parties" to the proceeding who can assert that they "lost" the decision, but persons who were not parties to the proceeding may be adversely affected by the rule and be allowed by an applicable law to challenge its legality. A quasijudicial proceeding, on the other hand, implies that the decision involves application of preexisting criteria or the

---

[9] *See* Hickam, *supra,* 16 Will L Rev at 331, n. 5.

We have no occasion here to consider whether a "public or private organization" similarly might claim to be "aggrieved" by virtue of its special function and relationship to the matter at issue without being "adversely affected" as an organization, because the present case was pleaded and decided on other grounds.

determination of particular facts or both, and that some persons are entitled to be heard before a decision is reached. *Cf. Neuberger v. City of Portland,* 288 Or 155, 603 P2d 771 (1979), *reh den* 288 Or 585, 607 P2d 722 (1980); *Strawberry Hill 4-Wheelers, supra.* A person whose interest in the decision has been recognized by the body making a quasijudicial decision and who has appeared and asserted a position on the merits as an interested person, rather than only as a source of information or expertise, can be "aggrieved" by an adverse decision within the meaning of section 4(3). As in *Marbet,* to be "aggrieved" a person must be more than abstractly dissatisfied with the outcome after the fact. The decision must be contrary to the request or other position that the person espoused during the proceeding.

Because interested participants in a local government land use proceeding may be "aggrieved" by an adverse decision while mere witnesses are not, the record of a local proceeding ought to identify in which capacity persons are heard if the local government wishes to challenge a later petition to LUBA. We have recognized before that this has not been customary in local proceedings. As we noted in *Strawberry Hill 4-Wheelers:*

> "[L]ocal policymakers are likely to be more concerned with giving those who appear at hearings a chance to speak than about distinguishing witnesses from 'parties' with an eye toward possible judicial review. That distinction is more familiar to judicial tribunals than to local governments when instructed to act 'quasijudicially.' However, mere participation as a witness at the hearing alone does not entitle one to relief by writ of review."

287 Or at 611. The same is true of the test of being "aggrieved" under the 1979 replacement of that writ by the petition for review to LUBA. The question who may be admitted, excluded, or limited to the status of a disinterested witness in the local proceeding will be governed by local as well as state procedural standards applicable to the particular proceeding. Even when the record is less than clear, we doubt that LUBA will find it a problem to distinguish whether a planner, engineer, lawyer, economist, or any other person appeared in the proceeding to assert a position on the merits in his or her own behalf or merely as a witness or as an advocate for a client.

It should be remembered that section 4(3) states who may petition LUBA for review of a quasijudicial land use decision, not who may seek review of a decision by LUBA. Under section 6a of the 1979 act, any party to a proceeding before LUBA may seek judicial review simply by virtue of being a party; nothing is said of being affected or aggrieved. LUBA itself is an agency, not a court, and the question on judicial review is whether LUBA's order was "unlawful in substance or procedure."[10] The quoted words provide less direction for judicial review than the amended version of the Oregon APA that was enacted at the same 1979 legislative session. Or Laws 1979, ch 593, now ORS 183.482(7), (8); *cf. Megdal v. Board of Dental Examiners,* 288 Or 293, 317-320, 605 P2d 273 (1980). Although Benton County did not refer to the judicial review section, we assume that it charges LUBA with an "unlawful procedure" and claims that its "substantial rights" were prejudiced, *see* note 10, by LUBA's acceptance of the petition.

 The interpretation to be given the statutory words "adversely affected" or "aggrieved" in section 4(3) doubtless is a question of law to be decided by the court. *See McPherson v. Employment Division,* 285 Or 541, 545-550, 591 P2d 1381 (1979). It appears from the foregoing that respondent may have had standing and that LUBA therefore reached the right conclusion on legal grounds other than those upon which it rested that conclusion. This is not meant to imply, however, that the grounds on which LUBA decided the issue were wrong. If an agency correctly understands the terms of the governing statute, the determination that a particular factual situation satisfies the criteria for invoking the agency's procedure is primarily for the agency to make. If LUBA applies the correct test, section

---

[10] The full section provides:

"Section 6a(8) The court may affirm, reverse or remand the order. The court shall reverse or remand the order only if it finds:

"(a) The order to be unlawful in substance or procedure, but error in procedure shall not be cause for reversal or remand unless the court shall find that substantial rights of the petitioner were prejudiced thereby;

"(b) The order to be unconstitutional; or

"(c) The order is not supported by substantial evidence in the whole record."

Or Laws 1979, ch 772, § 6a(8).

6a does not require a reviewing court to decide in each instance whether the person invoking LUBA's review did or did not have standing. Section 4(6)(a) requires the facts on which a petitioner claims standing to be stated in the petition. These include the facts concerning petitioner's appearance before the body that made the challenged decision and those that show whether the petitioner was entitled to prior notice and hearing as well as any facts claimed to show adverse effect. If any of these facts are disputed before LUBA, LUBA's decision will be upheld if it is supported by substantial evidence, even if the court would have reached the opposite decision.

### III. *LUBA's decision.*

As the parties and the agency considered it unnecessary to specify whether a petitioner claims as one "whose interests are adversely affected" or "who is aggrieved," they did not consider in this case whether petitioner might be "aggrieved" in any respect separate from Mr. Kenagy.

The petition to LUBA claimed standing on the basis that Mr. Kenagy owns a house and property near the river bank two miles downstream from the challenged gravel operation and that the river channel might eventually relocate through the proposed gravel pit and expose downstream banks to erosion. The county's response objected that "Kenagy's alleged aggrievement is at best speculative in nature" because actual gravel extraction under the conditional use permit would be subject to approval by the Corps of Engineers and planning officials so as to assure flood protection. LUBA's order recites these opposing contentions. It then concludes with respect to the issue of standing:

> "We agree that the likelihood of damage resulting to Mr. Kenagy's property appears to be remote. The letter from the Corps of Engineers, it seems to us, does not clearly indicate that Mr. Kenagy's property is at all threatened. However, the possibility of flooding is not so far removed from probability that we can say the likelihood of a flood is too remote to be considered in evaluating the alleged injury. [Footnote omitted] We cannot say, therefore, that the facts alleged by Mr. Kenagy are so speculative that they are not worthy of our consideration.

"The test for standing rests not so much on the likelihood of the injury in an absolute sense but the likelihood of the injury should the facts plead [sic] be true."

■ On appeal, the county criticizes the statement in LUBA's order that a petitioner has standing whenever there is a "likelihood of injury should the facts [which petitioner pleads] be true." By that test, says the county, anyone could claim standing to challenge a land use decision by the most farfetched allegations, such as that approval of a nonfarm dwelling on farm land fifty miles away might cause an earthquake that will destroy his residence. On its face, the wording of the order seems to justify the criticism. If and to the extent that standing is claimed upon assertions of a chain of adverse effects in the natural or social environment, it is LUBA's responsibility to consider and decide the likelihood of the alleged effects, if disputed, as an issue of fact, not to accept every pleaded assertion at face value.

■ We do not suggest that the alleged effects must be more likely than not or meet any specified degree of probability. This might well vary with the gravity of the adverse effect if it should occur. We mean only that when a specific adverse effect on a petitioner's individual interest is the claimed basis of standing, as it was here, LUBA cannot leave standing simply to the pro forma sufficiency of the pleading, as the literal terms of this order seem to do. Of course, a requirement that the agency examine the alleged potential effects upon a petitioner invoking or wishing to enter its proceedings invites, first, a separate factual dispute over these alleged effects that often is irrelevant to the merits of the main proceeding, followed by litigation over the decision to admit the petitioner long after the agency has decided the merits, as in this case. That is the price of defining a person's legal standing in a proceeding in terms of disputable factual causes and effects.

■ It appears, however, that the quoted portion of LUBA's order does not mean to confer standing on anyone who pleads some hypothetical course of events that would constitute an adverse effect if true. LUBA cited two of its former orders which suggest that a petitioner's allegations will be treated as true only if they are not challenged by

respondent.[11] The Court of Appeals noted that Kenagy's affidavit of a potential adverse effect on his property was uncontroverted and that LUBA found it to be corroborated by a letter from the Army Corps of Engineers. If LUBA concluded from the uncontroverted allegation and the corroborating letter that the possible "likelihood of damage" though "remote," was not "too remote to be considered," the Court of Appeals was not obliged to estimate the probability of its occurrence for itself. The court did not err in this respect.

The decision of the Court of Appeals is affirmed.

---

[11] *1000 Friends of Oregon v. Benton Co.*, 2 Or LUBA 324 (1981); *Parsons v. Josephine Co.*, 2 Or LUBA 343 (1981). LUBA's Rule 8(C)(2) requires a respondent who challenges a petitioner's standing on the basis that the facts alleged for standing are not true to state what respondent claims to be the true facts. Or Laws 1979, ch 772, § 4(7) authorizes LUBA to take evidence and make findings on such disputed allegations.